### LANCASTER ELECTRIC LIGHT, HEAT & POWER CO. v. PLATT IRON WORKS CO.

(Circuit Court of Appeals, Third Circuit. June 8, 1909.)

No. 33.

SALES (§ 176*)—CONSTRUCTION OF CONTRACT—WAIVER OF DELAY BY "ACCEPTANCE" OF MACHINERY.

A contract to furnish certain machinery, to be subject to tests after its shipment and installation to determine whether it met the warranties on which it was sold before it was to be fully paid for, which installation and tests would necessarily require a considerable time, provided that "the acceptance of the machinery upon arrival shall constitute a waiver of all damages for delays." *Held* that, construing the entire contract together, the word "acceptance" in such provision was used in the sense only of "receipt," meaning that the voluntary receipt of the machinery on its shipment, notwithstanding delays, should be a waiver of the same, although still subject to the tests as to its efficiency and final acceptance.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 436; Dec. Dig. § 176.*

For other definitions, see Words and Phrases, vol. 1, pp. 53–57.]

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

John G. Johnson, for plaintiff in error.
R. Stuart Smith, for defendant in error.

Before GRAY and BUFFINGTON, Circuit Judges, and BRADFORD, District Judge.

BRADFORD, District Judge. The Platt Iron Works Company, the defendant in error, hereinafter referred to as the plaintiff, brought an action of assumpsit in the Circuit Court of the United States for the Eastern District of Pennsylvania against the Lancaster Electric Light, Heat and Power Company, the plaintiff in error, hereinafter referred to as the defendant, and recovered judgment against the defendant for $6,541.68 damages, beside costs. For the reversal of this judgment this writ of error is prosecuted. It appears from the evidence and is not disputed that the plaintiff in 1907 was a manufacturer, among other things, of turbine machinery for use in connection with water power at Dayton, Ohio; that the defendant in the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

same year was engaged in the manufacture of electricity by water power at Lancaster, Pennsylvania; and that on or about February 20, 1907, the plaintiff and defendant entered into a written contract as follows:

"Proposal–Contract
Victor Turbine Machinery
Made by
The Platt Iron Works Company,
Dayton, Ohio, U. S. A.

Dayton, O., February 20, 1907.

The Platt Iron Works Company, hereinafter called the 'Company,' proposes to furnish to The Lancaster Electric Light, Heat & Power Company, Lancaster, Penna., hereinafter called the 'Purchaser,' the following Victor Turbine Machinery and Apparatus, according to the accompanying specifications and the following express terms and conditions:

Apparatus:

Two pairs of 42" Turbines, quarter turn discharge, draft-tubes, bulk-head thimbles, complete with Draw Rod Gate work, shaft extension, face couplings and sleeve jaw couplings, with Generator type bearings; also shaft extensions one 21" Vertical R. H. Wheel, with shaft extension and draft-tube.

Shipment:

One pair of the 42" wheels specified above with connecting shaft and coupling, including the Exciter wheel complete will be shipped on June 1st. The balance of the shipment will go forward 30 days thereafter. The half of couplings that go on Generator shafts bit up, and will be rough board, then shipped to Makers of the Generators.

Prices & Terms:

The 'Company' will furnish the above specified apparatus to the 'Purchaser' for the sum of Nine Thousand Nine Hundred ($9,900.00) Dollars F. O. B. cars at Lancaster, Penna., to be paid in funds at par in Dayton, Ohio, in the following manner, that is to say: 33⅓ per cent. on receipt of bill of lading; 33⅓ per cent. thirty days from date of bill of lading; and balance when the machinery is put in operation and tested as per guarantee. In any event, the time of last payment is not to exceed Four Months from date of bill of lading.

Erecting Superintendent:

The 'Company' will supply a competent man to superintend the erection of said machinery for the sum of $5.00 per day, plus expenses from date of his leaving the factory until his return; and in case the services of said man are not desired by the 'Purchaser,' the 'Company' shall not be held responsible for faulty or defective erection of this apparatus, or trouble arising therefrom.

General Guarantee:

The machinery covered by this agreement, is guaranteed to operate and fill the requirements of this agreement, when used and operated under the conditions specified herein. The machinery is further guaranteed against mechanical defects due either to faulty design or workmanship, and the 'Company' will furnish without charge, any part or parts thereof, which may prove defective under such conditions, during a period of six months from date of putting machinery in operation.

Guarantee:

Each pair of 42" Wheels, when working under 15' effective head, to develop 462 HP. at Generator Coupling, less 15% for friction on bearings, running at 125 revolutions, using the water at 80% efficiency, and that the 21" wheel will develop 57 Horsepower under the same head, running between 240 and 260 revolutions, with the same efficiency.

Specifications.

Each pair of 42" Turbines will be mounted on Horizontal Shafts, and each wheel will discharge into a separate quarter turn, 6' 6" in diameter. The wheel shafts will be made of the best mild forged steel, 7⅞" in diameter, coupled between the necks of quarter-turn, by means of forged flange coupling,

and this section of shaft, carrying the load of the backwheel, to be 6⅜″ in diameter, the head end extended through bulk-head and cover plate a distance of 6′ 3½″ from face of wall to center of wheel coupling, and the distance from the face of the same wall to the center of Generator is 29′ 4½.″ The two extensions of shaft, connecting the water wheel coupling to the Generator coupling, will also be made of mild forged steel, 7⅞″ in diameter, and made the necessary length, provided with one extra heavy face coupling, to connect to Generator for each side. The two shaft extensions will also be provided with a sleeve jaw cut-off coupling, for the means of disconnecting either pair of wheels, as desired. Said couplings will be operated by a lever, which will be attached to one of the stands; also said shafts will be supported by two Generator type bearings, having a base of 5′ long, and a vertical height of 69″ from the center of the shaft to the bottom of base. Each pair of wheels will be provided with steel thimble, made out of quarter-inch plate 7′ in diameter at the front end enlarged to 8′ diameter where passing through the wall; the wall being 40″ thick, provided with one steel angle; also one cast iron angle, and riveted to same; and bulk-head cover plate bolted on to the cast iron angle. In connection with this bulk-head cover plate the dome of each 42″ wheel at the head end, will be connected by a flange to said plate, thereby, removing the water pressure from the stuffing boxes. On each cover plate will be mounted all gate mechanism, which will be of our patent Draw Rod Type, removing all gears out of the water. All Gears and Pinions, for operating said gates, will be cut gears. The cross shaft on each pair of wheels, for connecting governor, will be extended 8″ outside of bearing. One end keyseated only, and the other end provided with a hand-wheel. The draw rods where passing through bearings will be covered with brass; also all bushings connected with same will be of brass. All adjusting screws used in connecting with adjusting boxes, that are under the water, will also be made of brass. At the head end of each pair of wheels, there will be provided an end thrust bearing of the Marine type. Said bearing will consist of a sleeve slipped on over the shaft, provided with necessary rings or collars, and is also to act as end thrust bearing and shaft bearing, having a water jacket and base under same to conform in design to the Generator stands. The distance from tail water to the center of the shaft will be 6′ 4″ and the vertical distance from center of the shaft to head water, 9′ 8.″ The length of the draft-tube will be 8′ 4″ from the center of wheel shaft.

The 21″ Right Hand Vertical Turbine will have a draft-tube extended the necessary length, provided with face coupling and the vertical shaft extended the necessary distance for making connection to the Exciter; also the gate shaft on said wheel will be extended through the wall, and provided with stuffing box; all stuffing boxes throughout, glands of same being made of brass, and all bearings that are babbitt lined, the babbitt will be first poured into the box and then afterwards hammered well, then bored out and scraped.

All the above to be in strict accordance with our detail drawing 17101 and General outline 17102. We also agree to furnish drawings of the 15″ 'I' beams, showing the necessary openings for the draft tubes; said beams we do not furnish, but will be furnished by the 'Purchaser' and put in position, ready to receive the Turbines on arrival.

It is further understood and agreed that all previous communications, either verbal or written, with reference to the subject matter of this agreement, are hereby withdrawn and annulled, and this contract shall be modified only by a duly approved supplementary agreement signed by both parties.

The 'Company' shall not be held liable for delays caused by fires, strikes, riots, or by any other causes beyond its control, and it is agreed that the time of shipment herein specified shall be contingent upon the furnishing of plans, drawings or other apparatus to be furnished to the 'Company' and to operate in conjunction with the apparatus herein specified and that the acceptance of the machinery upon arrival shall constitute a waiver of all damages for delays.

The foregoing proposal, made in duplicate, is subject to the approval of an executive officer of the 'Company' and shall not be binding upon the 'Com-

pany' until so approved, nor, unless accepted by the 'Purchaser' within ten days from date hereof.

Signed in duplicate.            The Platt Iron Works Company,
                                         Per T. R. Van Degrift.

Approved by
     R. S. Fowler, Asst. Secty. & Treas.
Accepted by Purchaser:
     Lancaster E. L. Ht. & Pr. Co.,
          Edw. D. Ruth, Supt.
Approved by
     Lancaster Electric Light, Heat & Power Co.,
          G. Searing Wilson, President."

By the foregoing contract the plaintiff undertook to furnish and sell to the defendant two pairs of 42" turbine wheels with shafts and coupling as therein described for the sum of $9,900 f. o. b. cars at Lancaster, one pair of wheels with shaft and coupling to be shipped on or before June 1, 1907, and the other pair of wheels with shaft and coupling to be forwarded within thirty days thereafter, and the purchase price to be paid as follows: 33⅓ per cent. on receipt of bill of lading; 33⅓ per cent. at the expiration of thirty days from date of bill of lading, and the balance "when the machinery is put in operation and tested as per guarantee." It is not altogether clear, in view of the fact that the total purchase price of $9,900 was not apportioned between the two shipments provided for, at what times the partial payments were to be made on account of those shipments respectively. Nor is it necessary under the circumstances disclosed in the case to decide this point. It safely may be concluded that under the contract 33⅓ per cent., or $3,300 of the purchase price was to become due not later than the date of the receipt of the bill of lading for the second shipment; the additional sum of $3,300 not later than the time of expiration of thirty days from the date of the second shipment; and the balance of the total purchase price immediately after the operation and testing of the machinery for the purpose of ascertaining its conformity or non-conformity to the requirements of the "guarantee"; the time limited for testing and the making of the last payment not to exceed four months "from date of bill of lading," which certainly cannot be later than the date of the bill of lading for the second shipment. It appears from the record that no portion of the machinery contracted for was shipped by June 1, 1907, or at or before the time of the expiration of thirty days thereafter, or, indeed, until July 29, 1907, when the plaintiff commenced making shipments of various parts of the machinery. The shipment of the first pair of turbine wheels with their shafting and coupling was not completed until August 19, 1907, nor was the machinery so shipped received by the defendant until seven days later. The shipment of the second set of wheels, shafting and coupling was not completed until on or about September 5, 1907. There was testimony to the effect that the defendant in anticipation of the receipt within the stipulated time of the machinery contracted for had torn out certain machinery of its own and had seasonably made preparations for the installation of the machinery to be furnished by the plaintiff. It further appears that prior to the bringing of suit the plaintiff had received from the defendant $3,300 on account of the total purchase price and that the plaintiff sued for the unpaid balance.

At the trial the defendant, for the purpose of establishing a counterclaim against the plaintiff for damages for delay in shipping the machinery contracted for, made two offers of proof which were denied by the court below. The denial of these offers furnishes the ground for two of the assignments of error. The third and remaining assignment of error is based upon a portion of the charge delivered to the jury. The several assignments of error are as follows:

"1. The court erred in refusing defendant's offer of proof, which was as follows:

'Mr. Johnson: I offer to prove that the works of the defendant are works engaged exclusively in the manufacture of electric power; that they had a contract for the supply of kilowatt power not to exceed 750 kilowatts per hour to a responsible company, the Edison Electric Company, which wanted the whole of that power; that their old works were insufficient to furnish that power and that they desired, therefore, to have these new wheels for the supply of the 750 kilowatts power per hour; that it was necessary that the wheels be installed before October, owing to the fact that high water would then prevent their installation until the succeeding year; that all these facts, including the fact of the contract with the Edison Company and that it would affect the kilowatt power, were explained to the plaintiff company before the contract was made, and it was told the plaintiff company that if the wheels were not furnished within the time, they would be unable to be installed until the following year, and that the defendant would lose the ability to furnish this kilowatt power; that the loss to the defendant company by reason of the delivery of the wheels too late to enable the installation at the time, extending the installation into the next year before it could be made, was the loss on the second set of wheels alone of over seventy-five hundred dollars, being the loss of the net amount which would have been received from the kilowatt power which they had contracted for and which they were unable to furnish. This in connection with the testimony already in the case in the correspondence and as to what was done when the machinery was received; and also to prove that when the shipments came they came in detached pieces; that the second set of wheels was never put together, and that the plaintiff was notified that the defendant would not accept these machines until there had been a test to show that the machines were within the power, and that the test could not be made until the spring of 1908.' "

"2. The court erred in refusing defendant's further offer of testimony. Said offer and the ruling of the court thereon were as follows:

'Mr. Johnson: Then I offer so much of the testimony as shows the explanation to the parties before the contract was entered into, of the condition of affairs and the necessity of time, of the contract which had been made, and the necessity to perform it, and of the loss which would occur in case the delivery was not made in time.' "

"3. The learned judge erred in charging the jury as follows:

'Perhaps I may say at this point, with regard to both machines, that although the jury has heard something in the case with regard to the possible loss of profits upon the part of the purchaser, owing to the delay in furnishing the machines beyond the time fixed in the contract, and beyond the time fixed by the extension of the contract. I instruct you that you are to pay no attention to that matter at all; that the defendant is not entitled to set up a defense based upon asserted loss of profits. That is all I need say, because I am sure the jury will accept the instructions of the court on that subject and lay that matter entirely aside, even if you have it in your minds at all.'

To said charge defendant's exception was as follows:

'Defendant's counsel excepted to so much of the charge of the learned judge as instructed the jury that they could not take into consideration any damages for delay.' "

It is admitted that the verdict for the plaintiff negatived all charge of breach of warranty; and the substantial question before us is whether the defendant had a right to introduce evidence, as proposed

in the rejected offers of proof referred to in the first and second assignments of error, to establish a counter-claim against the plaintiff for damages for delay in shipping the machinery to the former.   The portion of the charge to the jury referred to in the third assignment, in so far as excepted to by the defendant, also relates to the subject of damages for the defendant for delay.

The plaintiff contests on three grounds the asserted right of the defendant to establish a claim to such damages: first, that the contract expressly provides that "the acceptance of the machinery upon arrival shall constitute a waiver of all damages for delays"; secondly, that the amount of such profits as the defendant might have made under its alleged contract with the Edison Electric Illuminating Company, even aside from the above quoted provision of the contract, was not recoverable; and, thirdly, that no sufficient notice of such alleged counter-claim had been given by the defendant to the plaintiff. We shall consider at this point the first ground.   What the parties to the contract intended by the words "the acceptance of the machinery upon arrival" must control the construction to be placed by this court upon those words, and in order to ascertain the intent of the parties in their use they must be read in the light of other provisions in the contract.   Considered in and by themselves they doubtless would import a voluntary acceptance of the machinery upon arrival as satisfactory or in substantial conformity to the contractual requirements. But on an examination of the contract as a whole we are unable to attach to the word "acceptance" its usual meaning.   The elementary rule, applicable as well to contracts as to statutes, that the various provisions should, as far as may be reasonable, be so read as to avoid repugnancy and to give to each term its appropriate effect, to the end that the instrument may be sustained in all its parts, requires, we think, that the word "acceptance" must be treated as equivalent only to "receipt" in the sense of a voluntary receipt, in contradistinction to a rejection of the machinery upon arrival.   Unless the word "acceptance" be so read an irreconcilable inconsistency will be disclosed on the face of the contract.   The balance of the purchase price was not to be due until "the machinery is put in operation and tested as per guarantee," a provision qualified only by the words "in any event the time of last payment is not to exceed four months from date of bill of lading." The warranties, referred to as guarantees, contemplated that the ascertainment of the conformity or non-conformity of the machinery to their requirements might extend over a considerable period.   It is provided not only that the machinery should "operate and fill the requirements of this agreement, when used and operated under the conditions specified herein," but that if there were in the machinery "mechanical defects due either to faulty design or workmanship" the plaintiff would "furnish without charge any part or parts thereof, which may prove defective under such conditions, during a period of six months from date of putting machinery in operation."   These provisions are palpably of such a nature as to render an acceptance by the defendant of the machinery upon arrival within the usual signification of that term unreasonable and practically impossible.   For if there should be an acceptance upon arrival the defendant thereby would

wholly waive and discharge the plaintiff from all damages for nonconformity of the machinery to the requirements of the warranties. It is evident that the word "acceptance" must not be so read as to produce such a result, no opportunity having been afforded to the defendant to test the machinery. If, on the other hand, that word be held to mean a voluntary receipt of the machinery upon its arrival, the same to be held subject to testing, as provided for in the contract, all difficulty will disappear. Such receipt of the machinery could not under the terms of the contract discharge the plaintiff from the usual consequences of its non-conformity to the warranted excellence; but it well might discharge the plaintiff from "all damages for delays" and the waiver provided for extends no farther than to such damages. This construction of the contract cannot in any wise impose hardship upon the defendant. While the defendant upon the arrival of the machinery would not be competent to pass upon its conformity or nonconformity to the warranties, it would certainly know whether delay in its arrival beyond the time stipulated for its delivery would or would not defeat in whole or in part the purpose for which it had been ordered. The defendant had an election in view of the belated delivery either to refuse to receive the machinery and hold the plaintiff liable for all damages sustained through breach of contract, or in the exercise of its judgment, having knowledge of its own needs and purposes, to receive the machinery, thereby foregoing damages for delay, but retaining a right to hold the plaintiff in damages for non-conformity to the requirements of the warranties. Unless the defendant had at the time of contracting with the plaintiff a contract with the Edison Electric Illuminating Company it could not maintain a claim against the plaintiff for loss of profits on the contract with that company, there being nothing in the contract between the plaintiff and defendant authorizing generally the recovery of profits. The defendant better than anyone else could judge whether, under the circumstances and for the protection of its interests, it would be wise or unwise to receive the machinery, notwithstanding the delay. Having received and retained it, as appears in the record, the defendant is precluded from the recovery of damages for the delay. There is nothing in the correspondence between the parties to modify or affect the force of the provision relating to waiver of damages for delay. In view of the conclusion reached it is unnecessary to consider the other two grounds of contention on the part of the plaintiff. For the above reasons the judgment below must be affirmed with costs, and it is so ordered.