ROXFORD KNITTING CO. v. HAMILTON MFG. CO.

(Circuit Court of Appeals, Third Circuit.  May 14, 1913.)

No. 1,718.

SALES (§ 126*)—CONTRACT FOR SUCCESSIVE DELIVERIES—BREACH BY SELLER—
RIGHT OF PURCHASER TO RESCIND.

Defendant, which was a manufacturer of high grade underwear, gave two orders to plaintiff, each for 100,000 pounds of Egyptian cotton yarn to be delivered in weekly installments at its mills; deliveries under the second order to follow the first. The orders were given at about the same time, both based on the approval of a 1,000-pound sample, and one conditioned on the acceptance of the other. Defendant stated the purpose for which the yarn was required. It was then making a light single thread fabric for summer garments, and that made from the samples and from the early deliveries under the contract appeared satisfactory, but when the manufacture of a double thread fabric was commenced, which was required to be shrunk in hot water before it was made up, a secret defect in the yarn was discovered, consisting of small particles of blue and red fiber, which when placed in the hot water diffused the colors through the fabric and rendered the garments wholly unmerchantable as high-grade goods. The defect was unprecedented, and was due to want of care on the part of plaintiff's employés in permitting the particles to become mixed with the cotton in the mills. It was not to be expected and not discoverable by ordinary inspection, but on tests was found to exist in practically all of the yarn which had been delivered. *Held:* (1) That the two orders constituted a single unitary contract, the construction of which was for the court; (2) that the delivery thereunder of the defective yarn, unfit for the known use for which it was required, was a substantial breach and entitled defendant at its option to rescind the contract, refuse to accept further deliveries, and recover its damages, if such right was not waived and was promptly exercised.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 313–317; Dec. Dig. § 126.*]

In Error to the District Court of the United States for the Eastern District of Pennsylvania; James B. Holland, Judge.

Action at law by the Hamilton Manufacturing Company against the Roxford Knitting Company. Judgment for plaintiff, and defendant brings error. Reversed.

W. Horace Hepburn, of Philadelphia, for plaintiff in error.

Charles E. Morgan and R. Stuart Smith, both of Philadelphia, for defendant in error.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

GRAY, Circuit Judge. The plaintiff in error (hereinafter called the defendant) is a corporation of the state of Pennsylvania, and the defendant in error (hereinafter called the plaintiff) is a corporation of the state of Massachusetts. Each of said corporations does business in the state of its origin.

The action in the court below was one of assumpsit, brought by the plaintiff to recover damages for an alleged breach of two contracts for the sale of cotton yarn. One of said contracts was alleged in the

statement of claim to have been made on the 17th day of May, 1911, for the sale and delivery by plaintiff to defendant of 100,000 pounds of combed stained Egyptian yarn, deliveries thereof to be made at the rate of 5,000 pounds weekly, and under which plaintiff alleged that it had delivered 35,339 pounds of yarn, and that the defendant had paid for 20,943 pounds thereof, but that, contrary to its agreement, had refused to accept and pay for the remaining 14,396 pounds, and also refused to accept any further shipments of yarn under said contract. The other contract was entered into June 14, 1911, by which it was alleged plaintiff had sold to defendant 100,000 pounds additional of cotton yarn, to be delivered in installments of 8,000 pounds weekly, following the delivery of the order of May 17, 1911. It was alleged that no deliveries whatever were made under this order, the defendant having refused to permit the plaintiff to make such deliveries, and that plaintiff had been damaged in the sum of $7,500, being the difference between the cost of manufacture and the contract price agreed to be paid, making a total damage claimed by plaintiff of $13,243.

The material facts disclosed by the evidence contained in the record are, for the most part, undisputed and are as follows:

The plaintiff is a manufacturer of cotton yarn and the defendant a manufacturer of high-grade underwear. Prior to May 17, 1911, Catlin & Co., agents of the plaintiff, solicited the defendant for an order to supply it with stained Egyptian cotton yarn for the season of 1911–12. Defendant made known to Catlin & Co. the object and purpose for which the yarn was required, viz., the manufacture of fine underwear. Prior to May 17, 1911, a verbal order was obtained from the defendant by these agents of the plaintiff, for 100,000 pounds of the yarn referred to, subject to the approval by defendant of 1,000 pounds furnished for inspection; deliveries to be made at the rate of 5,000 pounds weekly, beginning June 15, 1911. On May 17, 1911, Catlin & Co., agents as aforesaid, accepted in writing the order for the manufacture and delivery of the yarn, in installments of 5,000 pounds weekly, beginning June 15th, and defendant assented in writing to the terms proposed by plaintiff.

In pursuance of this order, on June 7, 1911, plaintiff made the sample delivery of 1,000 pounds of yarn. This sample was made up by defendant into fabric inspected in the usual way, and accepted as satisfactory. On June 9, 1911, the said agents of the plaintiff solicited a further order from defendant, and entered into an agreement to deliver to defendant an additional 100,000 pounds of similar yarn, in consideration of the approval by defendant of the order of May 17th, changing the deliveries under the first order from 5,000 to 8,000 pounds weekly, and agreeing that deliveries of the second 100,000 pounds should begin immediately on completion of the first order. This verbal agreement and order was, on June 14, 1911, accepted in writing by plaintiff and confirmed in writing by defendant, as in first contract. Deliveries under the first order commenced June 28, 1911, and continued until plaintiff had delivered 35,339 pounds. These deliveries were to all appearances in good condition, corresponded with the sample, and seemed suitable for the defendant's purposes. De-

fendant commenced using this yarn about the 1st of July, by manufacturing therefrom what is called "single-thread fabric," from which it made light weight underwear. This continued until the 3d day of August. A few days prior thereto, defendant commenced the manufacture of a two-thread fabric, for making heavy underwear, to supply orders for the approaching cold season. The two-thread fabric was required to be wetted or soaked in hot water to prevent shrinkage of the garments made therefrom. Immediately upon being subjected to this process of shrinking, it was discovered that the yarn contained a secret defect, consisting of small particles of blue and red fiber running through it, the hot water causing the color to diffuse itself throughout the fabric, which rendered it wholly unfit for the purpose for which it was designed. The single-thread fabric theretofore made from this yarn not requiring to be shrunken, this defect was not before discovered.

It is not denied that the defects so discovered rendered the yarn in which they occurred unsuitable for the defendant's purpose, and the garments made from the yarn delivered unsalable as first-class goods, the testimony produced by defendant in that respect being abundant and of the most positive character. It was in evidence that this secret defect was not discernible without the wetting out in hot water of the fabric, and that this wetting out process was unnecessary and never practiced as to the single-thread fabrics. There was also testimony on the part of the defendant tending to show that the discovery of this defect was made in the latter part of July or about the 3d day of August, when the manufacture of double-thread garments was commenced, and that it was not discovered prior thereto. It appears, also, that immediately upon the discovery, defendant took some of the garments, which had been made up on orders, out of the cases, opening six or eight cases for the purpose of the test, and found the secret defect in all of them; that it also took some of the unmanufactured yarn delivered by plaintiff and made it up into fabric, which, after washing in hot water, displayed the same defect; that immediate notice was given by defendant to plaintiff to make no further shipments, as the yarn was unsuitable for the purpose for which it was ordered, and that request was made that some one be sent by plaintiff to make an examination.

There is nothing in the evidence to show that the usual, ordinary, and to be expected examination of the thousand-pound sample, upon which the purchase was made, would have revealed the defect that was only discovered when the double-thread fabric was submitted to the boiling process. The defect itself was of a character so extraordinary and unprecedented as tended to excuse the defendant from having made any examination or test to discover the same.

A representative of the plaintiff called on August 10, 1911, and was shown the fabric made up from the yarn, with the red and blue colors running through it. In order to test whether the last shipment contained the same defect, yarn was taken therefrom, made up in the presence of the representative of the plaintiff, and on being wetted exhibited defects of the same general character. The evidence showed

that defendant, being unable to dispose of any of the garments made up from the yarn delivered by plaintiff as first-class goods, was obliged to go into the market and purchase sufficient yarn to keep its mill going, so as to fill its orders.

At the interview on August 10, 1911, the representative of plaintiff stated that they would look into the matter and write the defendant respecting it.  On August 16th, the plaintiff, through its representative, wrote the defendant that it had made a thorough investigation at the mill, and that the trouble was caused by small quantities of colored cotton getting mixed with the Egyptian cotton, in going back and forth through a pneumatic tube from the picker room to the dye house. After discussing at length the character of the defects and minimizing the extent to which they appeared or would appear in the cotton already delivered, and offering to adjust any actual loss that had been sustained, the plaintiff company expressed its desire to continue shipments against the contracts with the defendant, concluding with the request that defendant would "please look into this further, advise us, and also inform us if we may continue shipping the weekly quantities of yarn called for on your contracts."  The defendant, by a letter dated August 24, 1911, acknowledged the receipt of plaintiff's letter of the 16th, and said that, after careful consideration, it still insisted that plaintiff take back all the yarn in cases, as well as that manufactured and in process of manufacture, that all orders be canceled, and that plaintiff pay to defendant the damage sustained by reason of the "unmerchantable quality of the yarn delivered," making repayment of all moneys theretofore paid by defendant to plaintiff on account.

There was further correspondence, in which propositions for adjustment and permitting the plaintiff to continue future deliveries, on condition that they be free from the defects complained of, were discussed and rejected by the defendant, cancellation of the contracts being insisted upon.  Suit was thereupon brought by the plaintiff, as hereinbefore stated, to recover the damages alleged to have been suffered by reason of the breach of contract by the defendant.

The case having been heard and submitted to the jury by the court, there was a verdict and judgment thereon for the plaintiff for $5,500. The assignments which accompany the writ of error sued out by the defendant are founded on exceptions to the charge of the court and to its refusal of certain of defendant's prayers for instruction to the jury.

The questions raised by these assignments of error concern: (1) The right of the defendant as buyer, under the circumstances, to rescind the whole of the unfilled portion of the first order, or the whole of both orders, considered as a unitary contract upon discovery of the alleged secret defects in the installments of yarn delivered, which, as alleged, rendered it wholly unfit for buyer's purpose, that purpose having been made known to the plaintiff, as seller, at the time of purchase; (2) the issues submitted to the jury and the manner of such submission.

The facts established by the testimony, as adduced by both plaintiff and defendant, justify the following conclusions:

First. The contract in suit was in writing and consisted of the correspondence embodying the antecedent verbal orders from the defendant, solicited by plaintiff's agents in Philadelphia. The first of this correspondence was a letter dated Philadelphia, May 17, 1911, from Catlin & Co., resident agents of the plaintiff, addressed to the defendant company in Philadelphia, stating:

"We enter your order for 100,000 pounds 18/1 to 32/1 combed stained Egyptian cops and cones. (All Cones to be Mule Spun, Foster Wind.) Soft Underwear Twist. Ship Cops in cases weighing not over 350 pounds gross, f. o. b. your mill."

After stating prices for the different grades and the times of payment, the letter stipulates:

"Deliveries, 5,000 pounds weekly, starting June 15th. About 4,000 pounds weekly to be delivered in Cops. Balance on Cones. Subject to approval of 1,000 pounds each of 22/1, 24/1 and 28/1 Cops as soon as possible."

Other matters are referred to, not pertinent to the present case. Then a letter from the defendant to the agents, Catlin & Co., as follows:

"We have your confirmation No. 1,654, corrected as to del's, and the same is in accordance with our understanding."

On June 14th, another letter from the agents, Catlin & Co., to the defendant, refers to another order for 100,000 pounds of yarn, in language identical with that contained in the letter of May 17th, except that the stipulation as to deliveries was as follows:

"About 8,000 pounds weekly following order of May 17, 1911, on which shipments are to be made at rate of 8,000 pounds weekly, starting in July. About 6,000 pounds weekly in Cops, balance on Cones."

On June 19, 1911, defendant writes to Catlin & Co.:

"We have your confirmation No. 1,816 and the same is in accordance with our understanding."

Second. These two orders constituted a single contract, confirmation of the first order being conditioned upon the acceptance of the second order. This appears upon the face of the letter of plaintiff entering the second order, as well as from the uncontradicted testimony of defendant's witnesses. The contract being in writing, its interpretation is a matter of law for the court, and we think the court below should have instructed the jury that the contract evidenced by the correspondence was a single and unitary contract between the parties.

Third. That it clearly appears, not only from the written contract but from the testimony, that, plaintiff being a manufacturer of cotton yarn and defendant a manufacturer of underwear, defendant made known to plaintiff the use, object and purpose for which the yarn was required, and that plaintiff agreed to manufacture and deliver, in installments, yarn suitable for defendant's purpose.

Fourth. The sale was conditioned upon the approval of the 1,000 pounds of the yarn sent by plaintiff to defendant for inspection, and those 1,000 pounds, having been inspected by defendant in the usual and ordinary manner, appeared to be satisfactory and were accepted as such on or shortly after June 7, 1911. That on the basis and in con-

sideration of the approval of this single sample of 1,000 pounds, plaintiff obtained a verbal agreement from defendant for the other 100,000 pounds, which on June 14th was embodied in the writing above referred to.

Fifth. That the defect discovered about the 1st of August, when double-thread fabric was being manufactured from the yarn of the first deliveries, was a secret and unprecedented defect, not discoverable by ordinary inspection.

Sixth. The evidence tended to show that no unreasonable time elapsed between the discovery of the secret defect and notice thereof by defendant to plaintiff. That on that account, defendant had decided to rescind the contract and refused further deliveries of the yarn. That this secret defect was found to exist in all or nearly all of the 35,000 pounds of yarn already delivered at the time the defect was discovered, and notice thereof given to plaintiff, including not only the later deliveries but the first deliveries, from which single-thread garments were manufactured. The evidence further tended to show that this defect was serious and far-reaching in its nature, rendering the goods manufactured from the yarn unmerchantable.

As a matter of law, such deliveries would, if made, be not only a breach of the implied warranty by the plaintiff, but they would constitute such default in performance on the part of the plaintiff as would give the defendant a right to rescind the contract. The evidence tends to show an absence of waiver on the part of the defendant of his right of rescission, if such right there were. The fact that, after inspection of the sample, the first deliveries of yarn were used in the manufacture of fabric for single-thread garments up to the time when, in the manufacture of double-thread fabric the secret defect was discovered, certainly constitutes no waiver of the right to rescind, or of an election to rely upon the implied warranty of the plaintiff as a collateral undertaking. The so-called sample of 1,000 pounds cuts no figure in the legal situation. The deliveries doubtless corresponded to the sample, but the secret defect was no more discoverable by inspection in the sample than in the deliveries thereafter. The buyer did not buy goods of the essential, though undiscovered, character of those constituting the first deliveries under the contract, and in those deliveries he did not get what he bargained for.

If the evidence establishes the situation above described, there can be no doubt of the defendant's right to have elected to rescind the contract and claim compensation for the injury suffered by it. It was not an unsubstantial or negligible default on the part of the plaintiff, nor can the plaintiff claim substantial performance on its contract with the defendant. That the defect in the goods was unknown to the plaintiff, does not serve to justify the imposition of the consequences of that defect upon the defendant. The defect was due to some want of care on the part of plaintiff's employés, and was one arising from the process of manufacture, but, even if it were not so caused, the case would not be different.

The evidence, if believed by them, was abundantly sufficient to warrant the jury in finding a substantial breach of contract on the part

of the plaintiff. If it be so found, the plaintiff's counsel admits that defendant "had the right, immediately upon discovery of the alleged defects in the yarn, to promptly notify the plaintiff of its refusal to further perform the contract, and thus relieve itself from liability for subsequent deliveries; or it had the option to permit the plaintiff to proceed to perform the contract to its conclusion and to rely merely upon damages for the plaintiff's breach. It was for the defendant to decide which of these two remedies it preferred to adopt." In other words, the implied warranty that the goods sold were fit for the disclosed purpose for which they were ordered, becomes a part of the substantive contract of sale at the option of the defendant. There can be no doubt of the correctness of this statement of the law since the decision of the Supreme Court in the case of Norrington v. Wright, 115 U. S. 198, 6 Sup. Ct. 12, 29 L. Ed. 366, whatever confusion may have existed in the authorities prior to that case. The right of the defendant, in such a situation as the evidence in this case tends to establish, to refuse further deliveries and rescind the contract of sale, is not an imperfect one. It is complete in itself and is not dependent upon anything that the plaintiff may do or propose to do. If the right has not been waived, the reasonableness or unreasonableness is not an issue for the jury to determine. Judge Sanborn, in delivering the opinion of the United States Circuit Court of Appeals for the Eighth Circuit, in the comparatively recent case of McDonald v. Kansas City Bolt & Nut Co., 149 Fed. 360, 79 C. C. A. 298, 8 L. R. A. (N. S.) 1110, very clearly states the doctrine of Norrington v. Wright. He says:

"The decisions in these cases [citing Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366, and other cases] hold that, where the vendor is required by an entire contract, as in the case at bar, to make successive deliveries of the articles sold, and the first deliveries fail to comply with the terms of the agreement either in the quality or quantity of the goods or in the times or places of delivery, the vendee by prompt notice of his refusal to further perform upon the discovery of the failure may relieve himself from liability for subsequent deliveries. This, however, is not his only remedy. He has the option, upon the discovery of the seller's default, to refuse to receive and pay for further deliveries, and thus to terminate the contract, or to permit its performance to proceed, and to rely upon his damages for the vendor's breach. But he may not delay his exercise of this choice.   *   *   * If he remains silent after he discovers the fault of the vendor, and permits him to incur the trouble and expense of the subsequent preparation and delivery of the contracted goods, he is thereby estopped from claiming a release from his obligation to receive and to pay for them on account of the defects in the earlier deliveries."

Turning now to the charge of the court below, we think it would be apparent that the learned judge of that court submitted the case to the jury upon a mistaken theory as to the issues determinable by them, and that he has submitted to the jury both the law and the facts of the case without adequate instructions as to how they were to be determined. The first assignment of error deals with the following extract from the charge of the court:

"I will say to you that I will leave the question in this case to you, whether or not, if there was sufficient to authorize a cancellation of one of these installments, there was sufficient to warrant this defendant in canceling all these installments of the first contract, the first 100,000. Here is

a corporation, as it claims, with a reputation for making first-class underwear, the highest class, Mr. Schloss claims, of any manufacturer in the United States, and it had delivered to it a yarn which had apparently a secret defect, so far as its use was concerned, for single-thread undergarments, because they could not detect it, and it was only when they wetted it out in two-thread undergarments that they could see it, and in the presence of the plaintiff they knit up some two-thread undergarments out of the very last delivery, and discovered the defect in that. Those deliveries, then, to the extent they had examined them, showed this defect. Was it reasonable that they should tell the plaintiff, 'We do not want any more of that yarn,' or was the defendant required to go on and accept the remaining deliveries of the first 100,000 and take his chances on the single-thread garments, and make what discoveries he could with the two-thread garments, or had it the right to say, 'We will not take any more of the yarn.' The plaintiff contends it was unreasonable to arbitrarily repudiate all these deliveries because the plaintiff claimed to be a high-class manufacturer of yarn, and claims to have told the defendant how this accident occurred, and that it would not continue, and that the defect was not in any of the other yarn, and that it would make good deliveries in the future. Then, under all the circumstances of this case, should or should not the defendant have tried some more of the deliveries which were to be made to it in the future. There were still about 40,000 pounds to be delivered on that first contract."

This submission of the question thus stated to the jury is accompanied by no instruction from the judge as to what would constitute a breach of the contract, or any definition of the right of rescission in the defendant that might ensue therefrom. So, also, the part of the charge which is the subject of the third assignment of error, must necessarily have served to confuse the jury as to the real issues in the case. It was as follows:

"Now, was it right for the defendant to arbitrarily say 'No,' or should not the defendant have given the plaintiff another chance to see whether it could not have made that yarn perfect and accepted it? This plaintiff company claims to be a high-class firm, with a good reputation, the same as the defendant claims that it is a high-class manufacturing concern with a good reputation. Should not this defendant have given the plaintiff another chance to deliver when it insisted it could and would, and that it was at that particular time delivering perfect goods? Would it be reasonable to suppose that this plaintiff could deliver those defective goods to all these other customers? Was it or was it not ascertainable by the defendant whether or not the yarn the plaintiff was manufacturing subsequently was defective? You will say, gentlemen of the jury, whether or not they ought to have accepted the delivery of the second 100,000 or not after you have passed on the first 100,000."

This was the substance of the charge, and it seems to us impossible to avoid the conclusion that the defendant was injuriously affected thereby. There is little or no controversy as to the facts in the case, and the evidence tends most strongly to establish a situation in which a right of rescission would result, as a matter of law, to the defendant. The judge should have instructed the jury substantially as prayed by defendant, that if the facts were found by the jury to be as the evidence hereinbefore stated tended to show them to be, the defendant, by prompt notice of his refusal, would have had the option, upon giving due and timely notice to the plaintiff, to refuse further deliveries of yarn under the unitary contract based on both orders, and to rescind the same, and to demand compensation, by way of damages, for the loss it might have sustained by reason of the plaintiff's breach of the contract, provided the defendant had not, by its delay or conduct,

after the discovery of the secret defect, estopped itself from exercising such right of rescission. The court, however, refused to give to the jury the substance of such an instruction.

For the reasons stated, we think the judgment below should be reversed, with a venire de novo.