## GUNDERSON v. BREY.

(Circuit Court of Appeals, Third Circuit.   January 5, 1914.)

No. 1764.

**1. Contracts (§ 270*)—Rescission—Time for Rescission.**

What is or is not a reasonably prompt exercise of the right to rescind a contract depends on the circumstances of each case.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1189, 1200; Dec. Dig. § 270.*]

**2. Sales (§ 121*)—Rescission for Breach—Election.**

Defendant contracted to purchase from plaintiff 20 car loads of flour of a specified quality and price, to be manufactured and shipped to defendant's customers as ordered.   Two cars were ordered and paid for by defendant through drafts with invoices attached.   Shortly afterward complaints were made by the consignees that the flour was not of the quality purchased, and on investigation defendant found it to be the fact and notified plaintiff, who admitted that the wheat was smutty and promised to make good any loss to defendant in settling with his customers, but on receipt of a bill five weeks later refused to pay anything. Defendant thereupon refused to accept further shipments. *Held*, that the request by defendant for reimbursement for the amount he was obliged to pay out was not an election to affirm the contract, and that whether he exercised his right to rescind for the breach within a reasonable time was a question for the jury.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 296–301; Dec. Dig. § 121.*]

**3. Sales (§ 153*)—Performance—Sufficiency of Tender.**

Where a contract for the sale and purchase of flour specified the grade, the shipment by the seller to apply on the contract of a car load not of such grade, although stated to be of a superior grade, was not a good tender under the contract.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 358–366; Dec. Dig. § 153.*]

In Error to the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Action at law by M. T. Gunderson against William F. Brey.   Judgment for defendant, and plaintiff brings error.   Affirmed.

Francis G. Gallager, of Philadelphia, Pa., for plaintiff in error.

John Weaver and C. Woods Coulston, both of Philadelphia, Pa., for defendant in error.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

GRAY, Circuit Judge.   An action of assumpsit was brought in the court below by M. T. Gunderson, the plaintiff in error, against William F. Brey, the defendant in error, to recover damages for a breach of contract.   The material facts, as gathered from the record and the statements of counsel on both sides, are as follows:

Plaintiff was engaged in the manufacture of flour at the village of Kenyon, Minn.   Defendant was a flour dealer and broker, doing busi-

ness at Philadelphia, buying flour from manufacturers for future delivery and reselling the same at a profit to himself or on commission to bakers and other users of flour.

September 1, 1910, defendant contracted with plaintiff for the purchase of 10 cars of a certain quality of flour manufactured and sold by plaintiff under his private brand of "Gunderson's Best." This flour was known as "Minnesota Standard Patent," a quality well known to the trade. It appears from the evidence that, by a "car" of flour was meant a quantity equivalent to 205 barrels of the net weight of 196 pounds each. This contract, therefore, was for the purchase of 2,050 barrels. The contract resulted from a telegraphic order by the defendant and a telegraphic acceptance by the plaintiff. The contract called for shipments during the months of September and October, 1910, on instructions or directions from defendant, delivered at Philadelphia rate points at $5.25 per barrel.

On September 20, 1910, defendant sent plaintiff another order by telegraph, for 5 cars of the same flour at the same price, to be delivered in the same manner and to be shipped on instruction from defendant in October and November. No instructions for shipment were given by defendant during the periods mentioned, on either the order of the 1st of September or that of the 20th of that month. Whatever obligation there was for shipments during the months mentioned, seems to have been waived by mutual consent. The plaintiff, however, appears to have been anxious to make early shipments on one or both of these orders, and asked defendant, who had informed him that he could not at once arrange for the shipments under either of the contracts, to get him orders for other qualities of flour to be shipped immediately. This defendant did at various times during the late fall and winter of 1910–11, to such an extent that plaintiff could not ship rapidly enough to suit the defendant's customers.

It was understood that the defendant might have the flour contracted for September 1st and September 20th, packed in sacks, branded either "Gunderson's Best" (plaintiff's private brand), or "Kron Prinz" (defendant's private brand), it being understood that, no matter how the flour was ordered branded, the same quality was always to be shipped.

Two orders—one for a car branded "Kron Prinz" and the other for a car branded "Gunderson's Best"—were sent by defendant to plaintiff, stating specifically that they were under the contract of September 1st. These shipments were made by plaintiff on December 6 and December 27, 1910, respectively, and were received, presumably, on or about December 20, 1910, and January 16, 1911, respectively, as upon those dates they were delivered to defendant's customers. They were paid for by defendant, however, before delivery, through draft with bills of lading or invoices attached. Up to March 10th, no orders were sent for any flour under the contract of September 20th, and the evidence supports the view taken by the learned judge of the court below, that these two contracts of September 1st and September 20th were separate and distinct contracts, the one in no wise relating to or being dependent upon the other. Correspondence between the parties designates the contracts by their dates, and the orders to which we have

referred were given and received specifically as under the contract of September 1st.

On January 28, 1911, the defendant wrote to plaintiff in regard to these shipments, as follows:

"Dear Sir: We have struck a snag in the last two or three cars of your flour received. We enclose herewith a postal card received Wednesday morning, and we immediately took the matter up and went to see this man on Thursday morning. We found the flour very 'dark,' and no comparison with what you have been shipping us. We took a sample out of four or five sacks and brought it home with us. We are sending you by mail a sample out of this car, which you will readily notice is away off. We tested it out with a sample, here in the office, that we had of a previous shipment. We are also mailing you sample of this lot for comparison. * * * "

One of the three cars, as appears from what is said in another part of the letter, was a car shipped under one of the orders above referred to, and not under the contract of September 1st. On February 1, 1911, defendant again wrote to the plaintiff:

"Since writing you about complaint in flour, we have another sample of the 'Kron Prinz,' and upon examination of the samples and comparison with your 'Gunderson's Best' brand, it looks as though you were trying to knock us on the quality of our stencil."

To the first letter, the plaintiff, under date of January 31, 1911, replied, admitting that some of the wheat out of which the flour in question was manufactured was "smutty," and promised to make good any loss to defendant in settling with his customers. On February 4th, 1911, defendant wrote plaintiff, as follows:

"Mr. M. T. Gunderson, Kenyon, Minn.          "Philadelphia, 2—4—1911.

"Dear Sir: I have to acknowledge receipt of your favor of the 31st, and note your admission that some of the wheat you have made flour from has been 'smutty.' How is it that none of this smutty wheat got into the Gunderson's Best brand, but did get in our Kron Prinz brand? It looks very much this morning as though we were going to have a heavy claim to pay on the last two cars, because of the quality, and if such is the case, we certainly shall look to you to take care of us; as we cannot afford to travel with heavy expenses to sell flour on ten cents per barrel brokerage and then have damages come back on us. The expense of maintenance is too great.

"Yours very respt.,                [Signed]   William F. Brey."

About this time, samples of both good and bad flour were submitted to Zook, an expert, of the Commercial Exchange, Philadelphia. February 11th, samples of the flour were submitted by the defendant to the "Howard Wheat & Flour Testing Laboratory," at Minneapolis, and on February 16th and February 20th, reports from this laboratory, stating that the flour was "just within the limits of soundness" but decidedly poor in color, were received. On the last-named date, these reports were sent by defendant to the plaintiff.

After some other correspondence, immaterial to the issue now before us, the following letter was received from plaintiff under date of March 3, 1911:

"Mr. William F. Brey, Philadelphia, Pa.   "Kenyon, Minn., March 3, 1911.

"Dear Sir: Yours of the 1st inst. at hand enclosing claim for $400.00, on car No. 71442 Wab.—shipped 12—6—10 and car No. 18190 C. G. W. shipped 12—27—10. Now Mr. Brey, I will say to you in plain language that I will not allow your claim because it is unreasonable, in fact I will not allow you

anything seeing you are so decidedly unreasonable. You got the grade of flour I sold you, *My Standard Pat.* We know just what you got as we have a baking test of this flour and it is up to standard. You must not think, Mr. Brey, that you can reimburse yourself on your purchases of high flour, in this manner, as I am too old in the business to be bulldozed like this. * * * We will ship you tomorrow a car of 'Kron Prinz' to apply on your purchases of last fall and shall expect to forward some of this flour right along until the contract is filled."

The defendant, as appears by the correspondence, had made two attempts to adjust with the dissatisfied customers this matter of the flour complained of by them. One dollar a barrel was the first demand. Defendant testifies that he subsequently succeeded in getting an agreement that 50 cents a barrel would be received in settlement of the claim for the poor quality of the flour, and so informed the plaintiff in a letter dated March 7, 1911, inclosing with his letter a receipt from the dissatisfied customer of $200.35, in full release of all claims. In the meantime, to wit, on March 4, 1911, plaintiff wrote to the defendant as follows:

"Dear Sir: Enclosed find invoice for car of 'Kron Prinz' shipped you today, to apply on sale of September 1st, 1910. This is my choice Patent, not the standard patent sold you. This flour is a much higher grade and more expensive to produce. I ship you this grade to avoid any possible chance for you to repudiate your contract on account of quality."

In the letter to plaintiff of March 7, 1911, above referred to, defendant wrote as follows:

"In reply to your letters of the 3d and 4th inst., I wish to advise you that I shall not accept any further shipments on the sale. The sale was made of your best spring wheat patent flour. From the first shipment that I received complaints (sic) about the quality of the flour, I immediately advised you, and mailed sample of the flour. In your letters to me of Jany. 31st, and Feby. 4th, you acknowledged that the flour complained of was 'smutty.' I also took a large sample of the flour from two cars and had a comparative baking test made, by the Howard Testing Laboratory, of Minneapolis. Their report shows that the flour just come within the limit of soundness, was decidedly poor in color, and showed the grade as a very fancy clear or straight flour. It did not come up to the standard spring wheat patent flour."

The car of which acceptance was refused in this letter, was that referred to in plaintiff's letter of March 4th, shipped under the brand of "Kron Prinz," "but is my choice patent, not the standard patent sold you," a flour of "much higher grade and more expensive to produce." It is with reference to this shipment of a higher grade of flour than that sold under the contract of September 1st, that defendant says in the last paragraph of the letter just quoted from of March 7th:

"When I make a sale of first spring wheat patent flour, I expect my customers to receive that grade of flour. I am 'too old in the business to be bulldozed' [quoting from the plaintiff's letter of March 3d] by accepting a straight or fancy clear flour in fulfillment of a sale of standard first patent flour."

Afterwards, on the same day, March 7th, defendant writes to plaintiff, as follows:

"Dear Sir: Enclosed I beg to return invoice for car 'Kron Prinz' shipped without instructions.
"Yours very respt.,                                    William F. Brey."

On March 10, 1911, we have the following telegram from plaintiff to defendant:

"Kenyon, Minn., Mch. 10, 1911.

"William F. Brey, Penna. Bldg., Philadelphia, Pa. Your two letters of the 7th received. I now understand you have repudiated your contract and I shall commence action for damages at once.  M. T. Gunderson."

At the trial in the court below, the case was submitted to the jury upon the evidence, the material parts of which are above summarized.

As already stated, defendant was a flour dealer and broker in the city of Philadelphia. As such, he obtained orders for flour from customers and transmitted the orders to manufacturers, among whom was the plaintiff; the orders here in question were duly forwarded by defendant to the plaintiff on September 1, 1910, and September 20, 1910. These were entirely separate orders, as found by the judge of the court below, and were never treated as one order by either plaintiff or defendant. Defendant sent shipping orders as rapidly as he could obtain them from his customers, but it appears, as we have said, that the stipulations as to the months in which the orders should be sent were disregarded on both sides, and while the defendant neglected to send orders in September and October, the plaintiff was unable, it appears, to fill orders during the greater part of December. No issue was therefore made in these respects at the trial. It also appears from the evidence that the order of September 1st was made upon a sample received by the defendant from the plaintiff, of standard wheat flour, known as "Gunderson's Best," and it was with this sample that the defendant compared the flour shipped in the two cars to Plainfield, N. J.

The assignments of error by plaintiff are founded upon exceptions to portions of the charge and instructions given by the court to the jury. These assignments are six in number. The questions involved in the first, fifth and sixth specifications of error relate to the charge, and are stated in the brief of the plaintiff in error, as follows:

"Did the court err in charging the jury to the effect that if any substantial portion of flour shipped by plaintiff on the contract of September 1, was materially defective, then the plaintiff as to that contract could not recover and the verdict must be for the defendant. Specifications of error Nos. 1, 2, 3."

We do not think that the court erred, either in its statement of the abstract propositions of law or in their application to the facts of the case as they might be found by the jury. The evidence before the jury is all disclosed in the record, and with reference to this evidence the language of the court must be considered. The general contention of the plaintiff now is, and probably before the jury was, that defendant had not exercised his claimed right of rescission within due time. No special request for instruction on this point appears to have been made by the plaintiff, but the facts before the court and jury, and now before us, do not seem to have required any special instruction in that respect.

There is little or no room for dispute as to the facts of the case, as the evidence consists mainly of written correspondence between the parties. The parties themselves discriminated between the contracts

of September 1st and September 20th, and we think, as we have already said, that the court below was right in treating them as separate and distinct sales of flour, and as the plaintiff had refused to make any deliveries on the second contract, the learned judge properly confined the attention of the jury to what occurred with reference to the contract of September 1st. The two orders sent by plaintiff to defendant,—one for a car load branded "Kron Prinz" and the other for a car load branded "Gunderson's Best," stated specifically that they were under the contract of September 1st.

As already stated, these cars were presumably received by the consignee at Plainfield, N. J., for whom they were ordered, about December 20, 1910, and January 16, 1911, respectively. We say presumably, because defendant testifies that on those dates he accepted and paid the drafts for the prices of the same, which were attached to the invoices or bills of lading. This feature of the case must be kept in mind, viz., that the cars shipped upon defendant's orders to defendant's customers were necessarily by this method required to be paid for, before they were delivered. No opportunity, therefore, was afforded for inspection before delivery, and defendant knew nothing as to the quality of flour received until he was informed by the complaints of his customers, after it had been actually tried out in baking. These were the first and only deliveries under the contract of September 1st, if we except the car load delivered to and accepted by the defendant about February 20th under that contract, as alleged by plaintiff but not admitted by defendant. Of this, more hereafter.

Referring again to the correspondence above recited, on January 28, 1911, defendant wrote to plaintiff, giving him the information that the quality of the flour was complained of by his customers, the consignees, as defective. On February 1, 1911, defendant again wrote that he had made another comparison of the alleged defective flour with the sample that he had from plaintiff of "Gunderson's Best," and that the complaints that he had received were justified. In response to the first letter, plaintiff admitted that the flour was "smutty," and promised to make good any loss incident to selling it to defendant's customers. Defendant, on January 11th, submitted samples of the flour to a testing laboratory at Minneapolis, and on February 20th received reports from the same, as stated above, and the same were duly submitted to plaintiff in letter of that date. In the meantime, it appears that defendant was endeavoring to settle with his customers for the defective quality of the flour in the first two shipments under the contract of September 1st, and in the letter of the 1st of March sent statement of what he had done in that regard, enclosing receipt in full from his customers. In reply to this letter, we have the letter of March 3d, quoted from above, in which plaintiff refuses to allow anything to defendant on account of this settlement.

It thus appears that defendant promptly notified plaintiff of the complaints of his customers as to the quality of the flour (which defendant had already paid for); that defendant was apparently diligent in seeking to ascertain the truth as to these complaints, by submitting samples of the flour in question to expert examination; and

that he waited for the report of the experts, in the meantime endeavoring to minimize, as far as possible, the loss which he was compelled to make good to his own customers.

The letter of March 4th, presumably received on March 6th, announcing that plaintiff had shipped a car load different entirely from that contracted for, was evidently meant as a tender, upon the refusal of which a breach of contract was to be founded. After the receipt of this letter and the previous letter of March 3d, defendant, on the 7th of March, wrote the letter above quoted from, declining to receive the flour thus shipped and returning the invoice with the notification that he would accept no further shipments on the sale of September 1st. This was clearly intended as a rescission of the contract on the part of the defendant, and was effective as such, unless he was estopped by undue delay or other conduct affecting the rights of the plaintiff, from claiming a release from his obligation to receive and pay for future deliveries of the flour.

[1] What is or is not a reasonably prompt exercise of the right of rescission, must depend upon the circumstances of each case. Delay in fully ascertaining, by expert examination, the true quality of the flour, of which the plaintiff was cognizant, cannot be attributed as a fault to the defendant, or as in any way affecting his right to rescind, nor can a delay attributable to an honest desire to adjust the controversy between the parties, as to the character of the flour, be counted to the disadvantage of the defendant. The 12 or 14 days elapsing between the date when defendant's letter of February 20th, inclosing the expert report as to the character of the flour, was received by plaintiff and the receipt by defendant of plaintiff's letters of March 3d and 4th, do not seem to us to constitute, under all the circumstances of the case, an unreasonable delay, or one prejudicial to the plaintiff's rights. On the contrary, this delay seems to us to have been calculated to impress the jury as evidence of a patient waiting by the defendant on the plaintiff, and of a not unreasonable desire to avoid coming to extremities in the matter. In this view of the case, the court were justified in avoiding any allusion to a possible estoppel on the ground of delay, and in this view plaintiff in error seems to have concurred, as no exception is taken to any supposed omission of the court to charge in that respect. Lancaster Elec. L. H. & P. Co. v. Platt Iron Wks. Co., 172 Fed. 314, 97 C. C. A. 148.

What the plaintiff in error did except to and make the ground of three or four assignments of error, is what was said by the court in a colloquy with counsel, after the conclusion of the charge, stated in the record as follows:

"Mr. Gallager: I would like to ask your honor whether you will charge the jury if the defendant elected to claim damages for the defendant, instead of rescinding the contract, the contract then subsisted, as to future deliveries. Your honor has not mentioned that. I do not know whether you intended to.

"The Court: You mean the claim for damages for the alleged defective flour?

"Mr. Gallager: If the defendant elected to claim damages, that he thereby elected to have the contract subsisting.

\* \* \* \* \* \* \* \* \* \*

"The Court: Gentlemen, on the question that Mr. Gallager has suggested, it appears that after the flour was alleged to be defective, Mr. Brey claimed a reduction of one dollar a barrel for the flour, and afterwards settled the claim with his customer for fifty cents on the barrel. If Mr. Gunderson had accepted that settlement, and settled on that basis with Mr. Brey, then Mr. Brey would have waived his right to claim that the contract was broken by Mr. Gunderson. But Mr. Gunderson did not accept the benefit of the settlement, and was not a party to it. The mere fact that Mr. Brey claimed that amount of damages from Mr. Gunderson, which Mr. Gunderson rejected, would not prevent Mr. Brey electing to reject the whole contract because of the delivery of the defective article, if you find that the article was not up to sample.

"Mr. Gallager: Will your honor allow me to suggest this, that if the evidence shows that the defendant did elect to claim damages, instead of rescinding the contract, that then the defect, while it may have existed, entitled the defendant only to damages, as he had elected not to rescind the contract.

"The Court: You did not present such a point before argument. I think I have covered that in what I have just said to the jury. I will give you the benefit of any error you may consider the court made.

"Mr. Gallager: My thought is, that the defendant may elect to take one of two courses, he either may accept damages for the defect, or he may rescind the contract, and if the evidence shows he elected to take damages, and claim damages, then the contract subsisted, but if he elected to rescind the contract, then the contract was ended. I merely suggest that to your honor, if you will charge that as law to the jury, leaving them to determine whether the evidence shows it.

"The Court: If I did charge them, I would charge them that that is not the law which applies to this case.

"Mr. Gallager: Will your honor allow me to specify exceptions to the charge later.

"The Court: You may do it now. The rule of this court is that exceptions to the charge must be made specifically before the jury retires."

[2] We think the court below was correct in its views as above expressed. Undoubtedly, a purchaser had an election, under the circumstances here presented, either to pursue the seller for damages incurred by reason of the seller's defective performance of his contract, or he might, with reasonable promptness after the discovery of this defective performance, rescind the contract and thus relieve himself from liability for subsequent deliveries thereunder. In exercising this right of rescission, the purchaser is bound, as far as possible, to put the seller in status quo, by returning or tendering the goods already received. This requirement, however, is not essential where the goods have already been paid for, as in this case was the fact. This election, however, must be decisively made, and the purchaser cannot resort to or use both methods of relief. Under the circumstances of the present case, the defendant was not bound to make his election until after the plaintiff had refused to reimburse defendant for the outlay he had made by reason of the defect in these first two deliveries of the flour contracted for. Defendant was not making an election of his remedy by merely requesting of the plaintiff a reimbursement of the money he had been obliged to pay to his customers. That request was neither a suit nor a claim for damages. Reimbursement of the money actually paid could be recovered by defendant, notwithstanding his rescission. What would have been the situation if plaintiff had settled with the defendant for these disbursements, is another question. Roxford Knitting Co. v. Hamilton Mfg. Co., 205 Fed. 842, 124 C. C. A. 44.

· The contention was ably and urgently made by counsel for the plaintiff, that the sales of September 1st and September 20th constituted in reality one contract, and that defendant had, by his letter of March 7th, repudiated this unitary contract, embracing the sales made upon those two dates. The court, however, took a different view, to which the plaintiff took exception and has founded thereon one or more assignments of error. · The view taken by the court, to which we have already referred, was that the two sales made on the two dates of September 1st and September 20th, respectively, constituted separate contracts, and the jury were so instructed. We have already pointed out that this instruction was abundantly supported by the evidence contained in the correspondence between the parties themselves. The court below, therefore, charged the jury that the contract of September 20th was still in force, and that the refusal of ·the plaintiff after the defendant's letter of March 7th, to fill the orders of the defendant under the contract of September 20th, was a breach on plaintiff's part and entitled defendant to a certificate of recovery for a commission at ten cents a barrel, that he would have received had the whole order been filled. The propriety of this instruction necessarily depended up- · on the correctness of the preceding instruction given by the court to the jury, that the two contracts were separate and distinct. We find no error, therefore, in the instructions given in the respect here excepted to.

[3] There are other matters that belong to the history of this case, as disclosed in the record, from which the charge of the court below has, we think, justly taken color, though not covered by any special exception or assignment of error. We have already called attention to plaintiff's letter of March 4th, tendering a car load of a different (though superior) grade of flour from that called for by the contract of September 1st. It is noteworthy in passing that this letter begins:

"Enclosed find invoice for car of 'Kron Prinz' shipped you today, *to apply on sale of September 1st, 1910.*" (Italics ours.)

This invoice was intended, as we have pointed out, to stand for a tender under the contract of that date, which, if rejected, would constitute a breach of that contract and thus furnish ground for a suit for damages. On its face, this letter was ineffective as a tender under the contract. The language of the plaintiff himself in this letter is:

"This is my choice patent, not the standard patent sold you."

Plainly, therefore, it was not a tender under the contract of September 1st. It was not the flour to which the contract referred, and the mere fact that it was a superior grade could not remedy this defect in the tender. Moreover, as counsel for defendant has pointed out, defendant was dealing with his customers on the basis of the particular flour ordered from plaintiff. To have injected into his trade a single car load of a superior grade, even at the same price as the flour ordered, would have tended to demoralize his dealings with his customers, and·disadvantage—not advantage—to defendant would have resulted therefrom. The court might well have been impressed with the view, that this tender of an invoice of a car load of a different quality

of flour was not a tender under the contract, and therefore formed no basis for the suit instituted by the plaintiff. Defendant's point was not without merit, that he would have been justified, after that tender, in refusing any further shipments on the sale of September 1st, and so have rescinded the contract on that ground, because the only tender that plaintiff made to defendant of the balance of the flour on the contract of September 1st, was confessedly by his own letter not the flour that he had sold. The jury, however, were not so instructed and the record does not disclose whether any such point was made at the trial.

Much stress was laid by plaintiff's counsel at the argument and in his brief upon a so-called "waiver" of defendant's right to rescind, by his having accepted and paid, February 20th, for a car of flour alleged to have been shipped under the contract of September 1st, without complaint. Defendant testifies that, though he made no complaint to plaintiff as to this car, his customers made such complaint to him, and it was a source of serious trouble between him and them. Defendant's counsel does not admit that this flour was shipped under the contract of September 1st. But however this may be, this question of waiver is not before us. It apparently was not pressed at the trial. Certainly no request was made for instruction by the court on this point, and no exception has been taken to the omission in this respect on the part of the court. Even after the charge, during the colloquy between counsel for plaintiff and the court, attention was not called to this point. So far as the record discloses, it is here made for the first time. That it is not properly raised, is obvious, and we express no opinion as to its merit.

We think the case was properly submitted to the jury, and the judgment of the court below is therefore affirmed.